UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
Civil Action No. 3:19-cv-790-DJH

ASHLEA BURR and MARIO DAUGHERTY,   PLAINTIFFS
on behalf of themselves and as guardians and
next friends of minor children, J.B., Z.S.W. and Z.S.

v.

LOUISVILLE METRO GOVERNMENT,   DEFENDANTS
JOSEPH TAPP, and UNKNOWN METRO POLICE OFFICERS

\*\*\* \*\*\* \*\*\*

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Ashlea Burr ("Ashlea") and Mario Daugherty ("Mario"), on behalf of themselves and as guardians and next friends of minor children, J.B., Z.S.W. and Z.S. ("Children")(collectively "Plaintiffs") state the following in support of their claims against Defendants, Louisville Metro Government ("Metro"), Detective Joseph Tapp ("Tapp"), and unknown Metro police officers ("Officers").

### PRELIMINARY STATEMENT AND ALLEGATIONS

Plaintiffs are a family of five who live in Louisville, including three children under the age of 16 who attend Jefferson County schools. On the morning of October 26, 2018, approximately 18 Swat Team officers raided their home, including smashing the front door, exploding materials, and drawing assault rifles on minor children. The raid was not supported by probable cause and was based purely on a search warrant affidavit that included materially false statements and omissions that merely alleged that someone could have been smoking marijuana at their residence on two occasions three weeks and three days prior to the raid.

Defendants' misconduct could have very easily resulted in the death of a parent or child for no good reason but did result in the violation of Plaintiffs' constitutional rights and significant emotional damage. Their conduct should be judicially redressed, not only to provide justice to Plaintiffs, but so that this does not happen again – perhaps next time with an innocent child or parent being shot and killed. This action is brought under 42 U.S.C. § 1983 and related state law claims.

## PARTIES and JURISDICTION

1. Plaintiffs are residents of Louisville, Kentucky.

2. Metro is a legal governmental entity.

3. Tapp and the Officers acted under color of law in Jefferson County, Kentucky.

4. The facts giving rise to this lawsuit occurred in Jefferson County, Kentucky, and Defendants are otherwise subject to the personal jurisdiction of this Court.

5. Plaintiffs initially brought this lawsuit in state court, and Defendants removed the case to this court, invoking its jurisdiction under 28 U.S.C. §1331 and §1343.

## FACTS

6. Plaintiffs reside at 1920 W. Chestnut Street, Louisville, Kentucky (the "Residence").

7. Plaintiffs are upstanding citizens, and the Residence is a single-family household.

8. J.B. was a 13-year-old male at the time of the raid, and his sisters, Z.S.W. and Z.S., were 14-year-old twins at the time of the raid.

9. The Children attend Jefferson County schools.

10. Plaintiffs are of African American decent.

11. Plaintiffs are not and were not drug dealers at the time of the raid.

12. On October 26, 2018, Tapp and a swat team of approximately 13 other Metro police officers raided Plaintiffs' Residence.

13. Tapp and/or other Officers broke into the house without reasonable advance warning, knocking or probable cause, and shattered the glass front door.

14. Tapp and/or other Officers used exploding devices during the raid, which extremely frightened Plaintiffs.

15. Tapp and/or other Officers drew assault rifles on Plaintiffs, including the Children, while yelling commands.

16. Plaintiffs initially thought they were being robbed.

17. Ashlea shielded her Children from the rifles, and Ashlea and Mario were extremely frightened that their Children would be maimed or killed and/or that they themselves would be maimed or killed. The Children were extremely frightened that they and/or someone in their family would be killed.

18. Mario was forced on the ground at gunpoint.

19. Z.S. ran through the back door and into the yard in an effort to reach her grandmother's house next door. Officers drew their assault rifles on her, yelling commands at her to get on the ground (back yard). Z.S. was extremely frightened, began crying and submitted to the ground. It was cold and rainy, and Z.S. was not wearing any socks, shoes or a jacket. She repeatedly requested to be taken to her grandmother's next door, but the Officers refused the requests, kept her in the cold, wet conditions, and kept their rifles on her.

20. Plaintiffs were searched, including one Officer expressing that Z.S. may have weapons in her hair.

21.     The Officers and Tapp continued to detain Plaintiffs, with rifles drawn on them, even after it became clear that the Residence was a family household – not a drug dealer's lair.

22.     Plaintiffs have suffered past, present and future severe emotional distress as a result of the raid, including, but not limited to the descriptions above, and also one or more of the Plaintiffs: (a) having difficulty sleeping; (b) being afraid when they hear loud bangs or knocks on the door; (c) being afraid to go outside; (d) being afraid of the police; (e) fearing being shot and/or death; (f) continuing to lock bedroom doors; and (g) undergoing counseling.

23.     Defendants initially misrepresented (through a claims adjuster) to Plaintiffs' counsel that no body camera footage of the raid existed and attempted to conceal this evidence.

24.     Metro later provided body camera footage but the footage was almost completely redacted visually and audibly.

25.     Plaintiffs expressly reserve the right to amend this Complaint after discovery.

26.     Metro falsely represented (through a claims adjuster) that Plaintiffs were "drug dealers" who deserved how they were treated.

27.     Defendants' conduct was willful, in bad faith, malicious, and/or with reckless disregard for Plaintiffs' rights.

## COUNT I – JOSEPH TAPP REGARDING THE SEARCH WARRANT

28.     Plaintiffs reassert all prior paragraphs as if fully set forth herein.

29.     In his "probable cause" affidavit, Tapp represented that a "black male named Anthony McClain is growing marijuana and has multiple bags of marijuana packaged for sale in the front bed room." Tapp also represented that "a white female named Holly was his girlfriend and owned the house."

30. Those representations were false, made willfully or in reckless disregard for the truth, and even the most basic due diligence would have revealed their falsity.

31. A simple search of Jefferson County's PVA records would have shown that a man named Kevin Hyde owns the house.

32. Ashlea and Mario rent the house.

33. Nobody named Anthony McClain or Holly lived at the house at or near the time of the raid.

34. Ashlea is not white.

35. The Children's grandmother lives next door.

36. Nobody in the house was growing marijuana or had multiple bags of marijuana packaged for sale.

37. The search did not reveal evidence of growing marijuana.

38. The search did not reveal multiple bags of marijuana packaged for sale.

39. The alleged facts purportedly observed by Tapp do not support probable cause that someone was growing and dealing marijuana at the Residence.

40. The supposed probable cause was that a "black male" named Mario Daugherty visited the house and was the registered owner of a Jaguar, a unidentified "black male" visiting the residence for approximately 10 minutes one day weeks prior to the raid, and that Tapp allegedly smelled "fresh marijuana" coming from within the Residence on two occasions.

41. One of the occasions when Tapp allegedly smelled marijuana was three weeks prior to the warrant being served. On the other occasion, Tapp did not even attempt to knock on the door. On neither occasion did Tapp obtain any additional information regarding who (if anyone)

was smoking marijuana or lived in the house – much less any information that would give probable cause that someone was growing and dealing marijuana.

42. The search warrant was also based on an alleged "tip" from an informant that occurred over 4 months prior to the raid and over one month prior to Plaintiffs even moving into their residence at issue.

43. Using such grossly stale information from a purported informant as the basis for the raid demonstrates not only the lack of probable cause, but also shows Tapp's willfulness or reckless disregard for Plaintiff's constitutional rights. Further, the fact that the search warrant affidavit does not disclose the stale date of the "tip" demonstrates willfulness.

44. Neither the search warrant affidavit nor Tapp's investigatory file discloses any information about the purported informant, much less information that would establish credibility of the phantom informant. In fact, the affidavit falsely states that the information came from a "complaint," not an informant.

45. There was no probable cause to believe that cocaine, heroin, or any other illegal narcotics were being distributed from the Residence.

46. Tapp, in his official capacity and under color of law, made materially false statements and/or omissions to obtain the search warrant with either knowledge of its falsity or omission or with reckless disregard for the truth.

47. Tapp is not entitled to qualified immunity.

48. Such conduct violated Plaintiffs' Fourth Amendment rights to be protected from unreasonable searches and seizures and to be free from warrants without probable cause.

49. Such conduct violates 42 U.S.C. § 1983.

6

## COUNT II – TAPP AND OFFICERS FOR ILLEGAL SEARCH AND SEIZURE

50. Plaintiffs reassert all prior paragraphs as if fully set forth herein.

51. The law requires that all entries, searches and seizures with a warrant must be executed in a reasonable manner.

52. It is completely unreasonable to execute a warrant that vaguely mentions someone potentially smoking marijuana at a residence with a swat team of 18 officers, exploding devices, forced entry, and assault rifles, particularly when no investigation was done to determine who lived in the Residence and given the other false statements and omissions in the affidavit.

53. Executing the warrant without knocking and announcing (i.e. "no knock") was unreasonable.

54. Tapp and the Officers' conduct after entry was also unreasonable and excessive, as detailed above.

55. Tapp and the Officers' conduct in executing the warrant violated Plaintiffs' Fourth Amendment rights to be protected from unreasonable searches and seizures.

56. Such conduct violates 42 U.S.C. § 1983.

## COUNT III – *MONELL* CLAIM AGAINST METRO

57. Plaintiffs reassert all prior paragraphs as if fully set forth herein.

58. Metro's policy or custom regarding obtaining and/or executing search warrants served to deprive Plaintiffs of their Fourth Amendment rights to be protected from unreasonable searches and seizures and to be free from warrants without probable cause.

59. Metro fails to adequately train its officers regarding obtaining search warrants in order to protect citizens' Fourth Amendment rights to be protected from unreasonable searches and seizures and to be free from warrants without probable cause.

60. Metro fails to adequately train its officers regarding executing search warrants in order to protect citizens' Fourth Amendment rights to be protected from unreasonable searches and seizures and to be free from warrants without probable cause.

61. Metro did not require its officers, including Tapp, who regularly obtained search warrants to complete updated, thorough and continuing training regarding obtaining and executing search warrants. Tapp received incomplete and outdated training on search warrants in 2010 and was not required to take the updated training described below.

62. Metro updated its training on obtaining and executing search warrants in January 2016. Metro then updated its training in January 2018 to include the following protocols, which were violated by Tapp in obtaining the search warrant:

> (a) the officer should have the search warrant reviewed by his/her sergeant, the prosecutor, and an officer who knows nothing about the investigation;
>
> (b) the officer should not use stale information for a search warrant and "stale" is defined as being more than 2 days old; and
>
> (c) the officer should demonstrate the reliability and credibility of the informant in the search warrant affidavit.

63. As alleged more specifically above, including, but not limited to, paragraphs 40-44 above, Tapp used grossly stale information from a purported informant but failed to establish the informant's credibility in the search warrant affidavit and instead misrepresented in the affidavit that the information was from a "complaint."

64. Even the training offered after December 2017 was deficient. It acutely (if not solely) focuses on "high risk" warrants and was even titled "Major Case Investigation." It repeatedly shows pictures of large piles of cash and drugs. It does not include sufficient safeguards

against treating low risk situations as high risk warrants. As a result, and although no warrant should have been issued upon Plaintiffs' residence, the warrant at issue was executed as a high risk warrant (instead of a low risk warrant) with 18 SWAT team officers in "no-knock" fashion, instead of being executed as a low risk warrant without the presence of SWAT.

65. Metro's lack of proper training, including training of Tapp, caused, in whole or in part, Plaintiffs' constitutional rights to be violated.

66. Further, Metro's "actual" policy and custom regarding obtaining and executing search warrants does not comport with its written policy. Metro's written policy at the time of the incident included the following:

    (a) officers being required to obtain the approval of their sergeant before applying for a search warrant and the sergeant must be present upon execution;

    (b) "accuracy" of the information in the search warrant affidavit is "vital";

    (c) the affidavit should specify the names of the occupants and detailed descriptions of such individuals;

    (d) the officer should not rely upon unauthenticated third party information or hearsay;

    (e) the officer should establish the credibility of an informant; and

    (f) the officer should corroborate the informant's information from other sources.

67. As specifically alleged above, Tapp did not comport with such policies.

68. Despite Tapp violating such "written" policies in irrefutably numerous and flagrant respects, Metro admittedly did not even investigate Tapp or the incident, much less discipline him or any other officer.

69. Further, the search warrant at issue was undisputedly executed without knocking and announcing, as confirmed by body camera footage. However, Metro's report after the incident falsely read; "after knocking and announcing for a reasonable amount of time, SWAT forced entry."

70. That falsity was never investigated by Metro, much less did it result in any discipline. Instead, as alleged above, Metro initially concealed the body camera videos from Plaintiffs and accused them of being drug dealers.

71. Instead of properly investigating the incident and disciplining Tapp and the Officers, even after being sued by Plaintiffs and this case receiving local and national media attention, Metro still ratified and condoned the conduct.

72. Likewise, Metro officers continued to obtain and execute unlawful search warrants, including, but not limited to, the Breonna Taylor warrant and the Stucker search warrant.

73. Metro's policy or custom results in the issuance of search warrants without probable cause and/or execution in an unreasonable manner in violation of Plaintiffs' Fourth Amendment rights.

74. Metro is deliberately indifferent to the known or obvious consequences of its true policies and customs.

75. Metro's conduct violates 42 U.S.C. § 1983.

## ADDITIONAL COUNTS – STATE LAW CLAIMS

76. Plaintiffs reassert all prior paragraphs as if fully set forth herein.

77. The following causes of action are asserted against Tapp and the Officers, in their individual and official capacities.

78. Tapp and the Officers restrained, confined and held Plaintiffs against their will, depriving them of liberty without consent.

79. Thus, they falsely imprisoned Plaintiffs.

80. Tapp and the Officers' conduct was deliberate, unreasonable, and/or with gross disregard for Plaintiffs' rights.

81. Tapp and the Officers' conduct exceeded all reasonable bounds of decency and was outrageous and intolerable in a civilized community.

82. The conduct caused severe emotional distress to Plaintiffs.

83. Thus, it amounts to the tort of outrage.

84. Tapp and the Officers' are liable for official misconduct, pursuant to KRS § 522.020 and KRS § 446.070, because they intended to obtain or confer a benefit or to injure Plaintiffs or to deprive Plaintiffs of a benefit, knowingly: (a) committing an act relating to his office which constitutes an unauthorized exercise of his official functions; or (b) refrains from performing a duty imposed upon him by law or clearly inherent in the nature of his office; or (c) violates any statute or lawfully adopted rule or regulation relating to his office.

85. Defendants have violated Section 10 of the Bill of Rights of the Kentucky Constitution to be free from unreasonable search and seizure and to be free from warrants without probable cause, and without description as nearly as may be.

## DAMAGES

86. As the result of each and every cause of action, Plaintiffs suffered damages, including emotional injuries, past, present, and future, in amounts to be determined by the jury, nominal damages, property damage, punitive damages, and their attorney fees, court costs, and interest.

**WHEREFORE**, Plaintiffs respectfully request this Court:

1. Grant trial by jury;

2. Enter Judgment against Defendants and in Plaintiffs' favor, including compensatory damages, punitive damages, court costs, interest at the legal rates, and attorney's fees; and

3. Grant any and all other relief the Court or jury deems appropriate.

                Respectfully submitted:

                /s/ Joshua T. Rose
                Joshua T. Rose
                ABELL ROSE LLC
                108 S. Madison Ave.
                Louisville, KY 40243
                (502) 450-5611
                jrose@abellroselaw.com

*Counsel for Plaintiffs*